2008 ME 147

**Kimberly J. NADEAU**

v.

**Robert M.A. NADEAU.**

Supreme Judicial Court of Maine.

Submitted on Briefs: May 29, 2008.

Decided: Sept. 25, 2008.

Timothy C. Dietz, Esq., Nadeau and Associates, Wells, ME, for Robert M.A. Nadeau.

Susan M. Schultz, Esq., Givertz, Hambley, Scheffee & Lavoie, P.A., Portland, ME, for Kimberly J. Nadeau.

Panel: SAUFLEY, C.J., and CLIFFORD, LEVY, SILVER, and MEAD, JJ.

PER CURIAM.

[¶ 1] Robert M.A. Nadeau appeals from a divorce judgment entered in the District Court (West Bath, *Field, J.*). Robert raises numerous issues on appeal, including that the court clearly erred in calculating his earning capacity, abused its discretion in awarding attorney fees, inequitably divided the marital estate, and demonstrated bias against him. We affirm the judgment in part, vacating only as to the awards of retroactive interim child support, retroactive interim spousal support, and attorney fees.

## I. BACKGROUND

[¶ 2] Robert and Kimberly J. Nadeau were married on October 11, 1982. They have one daughter and two sons, who were, respectively, eighteen, fifteen, and twelve at the time of the filing of the divorce complaint. Robert, who is currently a probate judge, maintains a law practice in York County.

[¶ 3] In June 2003, Robert and Kimberly separated after Robert became romantically involved with a divorce client (hereinafter referred to as Robert's girlfriend). After the affair came to light, Robert left the marital residence and resided with his girlfriend. The other two attorneys in Robert's firm departed from the practice, and litigation between Robert and the attorneys ensued.[1] During this period, Robert remained in contact with his children and visited them at the marital residence.

[¶ 4] In August 2003, Robert left his girlfriend and returned to live with Kimberly and the children. Robert and Kimberly attempted to rebuild their relationship and engaged in couples and family counseling. Financially, Robert began to struggle. He incurred significant legal expenses defending against: (1) a proceeding

---

1. For the purposes of our review of this divorce judgment, we do not draw a distinction between the actions he engaged in individually and those he engaged in through his firm, of which he is the sole shareholder.

initiated by the Committee on Judicial Responsibility and Disability regarding Robert's advertising during his most recent judicial reelection campaign; (2) an ethics complaint filed with the Board of Overseers of the Bar by his girlfriend following Robert's reunification with Kimberly; and (3) the lawsuit filed by the two attorneys that had departed from his firm.

[¶ 5] In May 2005, the girlfriend testified against Robert at a hearing held by the Board of Overseers of the Bar. The Board subsequently determined that Bar Counsel should seek Robert's suspension or disbarment. Within a matter of days of this decision, Robert initiated contact with a friend of the girlfriend and Robert and the girlfriend reunited shortly thereafter. The girlfriend subsequently requested that Bar Counsel drop her ethics complaint against Robert.

[¶ 6] Despite promises Robert had made to his children, on the morning of June 22, 2005, Robert moved out of the marital residence without warning. Robert barred Kimberly from entering the law firm's office, where she was employed as a bookkeeper. In response, Kimberly terminated all direct contact with Robert, refusing to answer the phone, discontinuing the postal service to the home, and forwarding all correspondence from Robert to her attorney for review. Less than two weeks after he left the marital residence, Robert and his girlfriend gave an interview to a local newspaper in which he stated, "I've never been happier in all my life." The resulting article detailed Robert's reunification with his girlfriend, reported Robert's statement, described his purchase of an engagement ring, and included a photo of the couple.

[¶ 7] On July 6, 2005, Kimberly filed for divorce and the case was thereafter specially assigned to a single judge. Robert voluntarily began to make bi-weekly payments of child support that continued throughout the pendency of the divorce and which totaled over $24,000 as of the final hearing.

[¶ 8] Although the automatic preliminary injunction barred the parties from disposing of marital assets, Robert proceeded to purchase a house for $431,500 in August 2005, to serve as a residence for him, his girlfriend, and her children. To finance this purchase, he liquidated a portion of his retirement account, resulting in an early withdrawal tax penalty. Kimberly also made withdrawals from the marital accounts, using roughly $23,000 from a home equity line and a marital savings account to pay the retainer for her attorney and to support herself and the children. She subsequently obtained new employment at an hourly rate that slightly exceeded the rate she had earned at the law firm, resulting in income of approximately $34,000 per year.

[¶ 9] On August 15, 2005, Kimberly filed a number of motions with the court, seeking: (1) to waive mediation; (2) an advancement of $20,000 in attorney fees; (3) a finding of contempt based on Robert's recent home purchase; (4) spousal and child support; and (5) sole parental rights and responsibilities pending divorce. Robert responded with his own motion to enforce, citing Kimberly's withdrawal of $23,000 from marital accounts, and he also sought primary residential care of the children based on Kimberly's refusal to communicate with him. The court denied Kimberly's motion to waive mediation, and, by separate order, consolidated the remaining motions for hearing at a later time. The parties subsequently attended mediation where they sat in separate rooms, used a shuttle mediator, and resolved no issues.

[¶ 10] On July 17, 2006, the District Court issued an interim order pending di-

vorce. The court granted shared parental rights, ordered the children to attend counseling with Robert at least once per week with a specific therapist, and ordered Kimberly to both cooperate with and to make every effort to ensure the children participated meaningfully in this counseling. The court also: (1) ordered Robert to deposit all money in his possession that belonged to his sons into an interest— bearing account controlled by his attorney;[2] (2) assigned Robert an imputed income of $135,000; (3) ordered Robert to pay $1100 a month in interim spousal support and $407.02 per week in child support, made retroactive to August 12, 2005; (4) ordered Robert to pay $12,000 to Kimberly's attorney; and (5) declined to address the remaining outstanding motions until the time of the final hearing.

[¶ 11] Shortly after the court issued its interim order, Robert purchased yet another home for $499,000 without having sold the home he had purchased a year earlier for $431,500. He later explained his decision to purchase a second home by claiming that the basement of his existing home had suffered significant flooding during a strong storm and that he and his girlfriend "never really liked" the home. Kimberly filed a motion for contempt, arguing that this purchase was in direct violation of the preliminary injunction. Robert responded with his own motion to enforce, claiming Kimberly had failed to deliver the children to weekly counseling as required by the temporary order and that he still had no contact with his children. Even though Robert had been awarded shared parental rights and responsibilities pending divorce, Kimberly refused to communicate with Robert in any meaningful way regarding the children, claiming that Robert speaks to her in

a manner she felt was verbally abusive. In addition, the sons refused any contact with Robert.

[¶ 12] In September 2006, with the permission of both parties, the court met in camera with the sons in an attempt to convince them to engage in some sort of modest visitation with their father. The sons, who demonstrated themselves to be mature and intelligent, clearly articulated to the court their own, independent perceptions that Robert had betrayed and publicly humiliated them. The court thereafter issued a pretrial order that did not include any provision requiring reunification counseling between the sons and Robert.

[¶ 13] The court held a final hearing in November 2006. At the start of the hearing, Robert objected to a number of evidentiary rulings that had been made prior to trial. The court delayed ruling on whether it would vacate the portion of a pretrial order that barred Robert from calling his children as witnesses, stating that it would consider the issue only after it had an opportunity to determine whether their testimony was necessary. The court proceeded to hear testimony on three separate days.

[¶ 14] The court issued its judgment in July 2007. In a detailed and strongly—worded decision, the court found that Robert had a "self-centered and insensitive world outlook" and had engaged in "self-destructive behavior that has caused the break-up of his marriage, the break-up of his law firm, and a significant amount of litigation." The court found that throughout the "entire period" of the divorce proceeding, Robert's annual earning capacity had been $200,000, and the court employed this finding for its child and spousal sup-

---

**2.** After communication broke down between Robert and Kimberly, Robert closed two savings accounts belonging to his sons to which he had sole signature authority.

port computations. The court also found that Robert had not paid any child support during the pendency of the case. The court awarded Kimberly $552.37 per week in child support retroactive to a date that was approximately four weeks before Kimberly had filed for divorce, and calculated a child support arrearage of $43,627. Robert was ordered to pay this amount in twelve equal monthly installments.

[¶ 15] The court awarded Kimberly sole parental rights and responsibilities for the two boys because communication between the parties, as well as the communication between Robert and his children, had "broken down completely and irretrievably." The court found that the boys' "anger at their father was palpable, and they clearly articulated not only that anger, but also the factual basis to support it . . . [and that they] articulat[ed] what they themselves perceived as their betrayal and public humiliation by [Robert]." Conclud-

ing that the boys' reunification with Robert, "if it happens at all, will take far longer than the jurisdictional reach of this Court," the court ordered that Robert may have parental contact with the boys "at such dates, times, places and under such circumstances as shall be agreed upon by the parties after consultation with each minor child involved."

[¶ 16] The court also found that Robert had been "involved in a course of conduct that can only be described as economic misconduct."[3] In arriving at its equitable distribution scheme, the court emphasized Kimberly's primary role in raising the children and her contribution to Robert's law practice, as well as the parties' disparate economic circumstances and prospects. The Court found that Kimberly "is now, and always will be, a wage employee, with no opportunity to generate capital," and that Robert could be expected to "generate capital . . . in substantial quantities" given

---

3. The court found that:

> Throughout the pendency of this divorce, [Robert] has refused to satisfy his financial obligations to [Kimberly] and the minor children. He has used as his excuse that he does not have any money to do so, because his income from the law firm has decreased. Yet during this period he was able to afford approximately $30,000 to pay [his girlfriend's] deficiency and moving expenses, buy her an $8,200 engagement ring, diamond earrings, a diamond pendent, take her on trips to Florida, Philadelphia, a Caribbean cruise, Nova Scotia and San Francisco, provide her with a job and support her and her two children in his home. In addition, he has purchased two new homes, incurring in the process approximately one million dollars in debt and liquidating roughly $50,000 from his retirement account (without setting aside any money for the 10% penalty and taxes that he incurred). He purchased $12,000 worth of furniture for this new home. The first of these houses was put on the market for reasons and with a suddenness that indicates little or no thought involved. The

> evidence shows that the sale of this house may well end up in a deficiency. He also submitted a Form 1099–MISC to the Internal Revenue Service representing that in 2005 he paid $4000 in rent to [Kimberly] and $17,152 in other taxable income. The rent amount represented money paid by Nadeau & Associates PA to [Robert] for his home office while he lived at [the marital residence]. The $17,152 represented the amount in [Kimberly's] saving account when [Robert] left. He also cancelled a mortgage payment on the marital residence without informing [Kimberly], who learned of it when she received a deficiency notice and was required to pay late fees. His conduct toward [Kimberly] throughout this divorce has been one of economic warfare, all the while claiming to be poor, posing as being on the higher moral ground, but supporting his own lifestyle completely at [Kimberly's] and their children's expense.

With the exception of its finding that Robert did not provide his children financial support throughout the divorce process, the court's findings regarding economic misconduct are supported by competent evidence in the record.

his law degree and reputation in York County. The court also emphasized that the substantial debt Robert had incurred during the divorce process was due to his "recent poor decisionmaking," and, as that debt was paid off, Robert's law firm "will once again generate value exponentially."

[¶ 17] The court divided the marital property as follows: Kimberly received almost all of the personal property and furniture located at the marital residence, an award the court valued at $12,500. It further assigned Kimberly additional personal property that it valued at $22,693. Kimberly also received the marital residence, valued at $500,000, subject to the outstanding loans, which left approximately $371,000 in equity. Finally, the court assigned Kimberly roughly $19,470 in debt, along with joint liability in the event their daughter defaults on a college loan, and the right to claim the children as dependents for tax purposes. The total certain value of this award was approximately $387,000.

[¶ 18] The court ordered the first of the two homes Robert purchased during the divorce to be sold. The property was valued at $400,000, with an outstanding mortgage loan of $340,100 and an equity line of credit of $42,500. Following the payment of a judicial lien on the property arising from Robert's litigation, any profit or deficiency resulting from the sale was awarded to Robert. Robert was awarded the second of the two homes he purchased during the divorce, which the court valued at $499,000, subject to two mortgage loans in the amount of $399,200 and $74,600; personal property valued at approximately $50,400, including the $8200 diamond engagement ring he had purchased for his girlfriend; and furniture valued at $8000. Most significantly, the court awarded Robert sole ownership of his law firm which the parties had, by stipulation, valued at

$20,000. The court accepted the stipulated value, but noted that it left the court "incredulous." Finally, the court assigned to Robert approximately $54,000 in debts, joint liability for their daughter's college loan should she default, and sole liability for any damages resulting from his ongoing litigation. The total certain value of Robert's award was approximately $41,000, excluding any profit or deficiency that might result from the sale of the first home and his outstanding 2005 tax liability.

[¶ 19] The court awarded Kimberly $3000 a month in spousal support retroactive to the date Kimberly filed for divorce, which resulted in an arrearage, after certain credits, in the amount of $60,543, to be secured by a lien against the two residences purchased by Robert. It also ordered Robert to pay $50,000 of Kimberly's $56,268 in attorney fees, finding that his "unrestrained and frequently intemperate filings ... ignored the tenets of common practice in this State" and "generated excess fees on [Kimberly's] part [that] he should pay for." It then denied all outstanding motions to the extent that they conflicted with its judgment.

[¶ 20] Robert subsequently filed a motion for findings of fact and conclusions of law which the court denied on August 8, 2007. Robert then filed this appeal. In October 2007, he filed a motion in the District Court for entry of a final judgment of divorce notwithstanding appeal, which the court denied.

## II. DISCUSSION

[¶ 21] Robert raises a number of issues on appeal. Although we have carefully considered each issue raised, we only address Robert's contentions that the court erred or abused its discretion (A) by refusing to grant his motion for entry of a final judgment of divorce after the end of the

appeal period; (B) by refusing to sanction Kimberly for purportedly failing to mediate in good faith; (C) by prohibiting him from calling his teenage sons to testify; (D) in awarding parental rights and responsibilities; (E) in dividing the marital estate; (F) in determining his gross income for purposes of calculating child and spousal support; and (G) in awarding attorney fees. We conclude by addressing Robert's contention that the trial judge abused his discretion by failing to grant Robert's motion seeking the judge's recusal from the case.

## A. Entry of Final Judgment of Divorce

[¶ 22] Robert first argues that the trial court abused its discretion by denying his motion for a final judgment of divorce notwithstanding this appeal. The motion was filed after Robert had filed his notice of appeal and after the period for filing an appeal had run.

[¶ 23] Except in certain enumerated situations, once a notice of appeal is filed, "[t]he trial court shall take no further action pending disposition of the appeal by the Law Court." M.R.App. P. 3(b). Robert contends that his motion for final judgment was not subject to this restriction because 19–A M.R.S. § 906(3) (2007) authorizes a trial court to grant a final judgment of divorce "upon motion for entry of final judgment during the pendency of the *appeal period*."[4] (Emphasis added.)

[¶ 24] Contrary to Robert's contention, "appeal period," as used in section 906(3), does not mean any time during the pendency of the appeal. Although the term is not defined in title 19–A, the Maine Rules of Appellate Procedure contemplate that a motion that may be filed during the "appeal period" must be filed during the period within which a party may file a notice of appeal, and not merely at any time while an appeal is pending. *See* M.R.App. P. 2 Advisory Committee's Note to 2001 amend. (addressing the extension of the time to file an appeal when a motion is filed "within the appeal period"); *see also* M.R. Civ. P. 59(e) Advisory Committee's Note to 2000 amend. (addressing "whether the appeal period is suspended" while a court disposes of a motion to reconsider a judgment). Accordingly, Robert's motion was untimely because it was filed after the filing of his notice of appeal, and the trial court did not abuse its discretion in denying the motion.

## B. Failure to Mediate in Good Faith

[¶ 25] Robert contends that the trial court abused its discretion by not sanctioning Kimberly for purportedly failing to make a good faith effort to mediate.

[¶ 26] Mediation is required in all contested divorce and parental rights actions unless waived by the court for extraordinary cause shown. M.R. Civ. P. 92(b)(1); *see also* 19–A M.R.S. § 251(2)(B) (2007). All parties are required to make a good faith effort to mediate all disputed issues. M.R. Civ. P. 92(b)(5)(E); *see also* 19–A M.R.S. § 251(4) (2007). "When agreement through mediation is not

---

**4.** Title 19–A M.R.S. § 906(3) (2007) states in full:

> **3. Finalization.** In an action for divorce under section 902, the trial court may, *upon motion for entry of final judgment during the pendency of the appeal period,* grant a final judgment of annulment or divorce between the parties if the court expressly finds that there is not just cause

for delay and entry of judgment will not prejudice the legal or equitable rights of a party during the pendency of an appeal. The filing of a motion under this subsection does not stay an award of child or spousal support or parental rights and responsibilities, except by order of the court under the Maine Rules of Civil Procedure.

(Emphasis added.)

reached on an issue, the court *must* determine that the parties made a good faith effort to mediate the issue *before* proceeding with a hearing." 19–A M.R.S. § 251(4) (emphasis added). While engaging in this inquiry, however, a court may not consider any evidence of conduct or statements made by any party or mediator at the mediation session. *See* M.R. Evid. 408(b). Accordingly, where a party claims that the opposing spouse mediated in bad faith, the only statements or conduct of the opposing spouse that the party may rely on are those that occurred outside of the mediation.

[¶ 27] In the instant case, the record did not compel the court to find that Kimberly had failed to mediate in good faith. Although it can be inferred from Kimberly's motion to waive mediation that she generally opposed participating in mediation with Robert, the motion itself presented facially legitimate grounds for the requested relief. In addition, the approach the mediator adopted, apparently at Kimberly's urging, of having Kimberly and Robert in separate rooms during the mediation, without meeting face-to-face, is a recognized mediation method in high-conflict cases and does not establish bad faith by Kimberly. Finally, the court properly excluded, pursuant to M.R. Evid. 408(b), the evidence Robert attempted to introduce at the final hearing regarding the mediation. The court did not err in denying Robert's motion seeking sanctions.

C. The Examination of Children During a Divorce Proceeding

[¶ 28] Robert next alleges that the trial court abused its discretion by prohibiting him from calling his teenage sons to testify.

[¶ 29] Whether a child should be permitted to testify in his or her parents' divorce action is a sensitive question that does not lend itself to a simple answer. Because a child of any age is presumed competent to testify unless otherwise disqualified, *State v. Rippy*, 626 A.2d 334, 338 (Me.1993), a court may not bar a witness from testifying based on nothing more than the fact that the witness is a child of the parties. *See* 24 AM.JUR.2D *Divorce and Separation* § 379 at 538 (1998). Where, however, the prospective testimony of a child in a divorce proceeding may be unfairly prejudicial in that it will be emotionally harmful to the child or undermine a child's long-term relationship with either or both parents, the testimony may be properly excluded under the tenets of M.R. Evid. 403. Similarly, if the testimony will be cumulative or a waste of time, the court also has the discretion to exclude the evidence in accordance with Rule 403. In addition, a court has the discretion to defer ruling on whether to permit a child's testimony so as to make that determination relative to the body of evidence otherwise presented by the parties. *See* M.R. Evid. 611(a); *see also State v. Millay*, 2001 ME 177, ¶ 11, 787 A.2d 129, 131–32 (noting "the wide discretion granted to trial courts to determine whether the value of the proffered evidence is substantially outweighed by the danger of unfair prejudice").

[¶ 30] In the instant case, the court, with both Robert's and Kimberly's permission, met in camera with the sons prior to the final hearing. The sons articulated their sense of betrayal by Robert in a manner that the court explicitly found to be uncoached. The District Court (Lewiston, *Westcott, A.R.J.*) subsequently issued a pre-trial order that barred Robert from calling his sons as witnesses. Robert objected to this ruling at the final hearing and informed the court that he sought to examine his sons in order to generally

inform the court's best interest analysis, and to specifically address whether the boys truly desired to have no further contact with him. The court responded that its usual practice was to wait until the end of a case before deciding whether the testimony of a child witness is necessary and informed Robert that it would take his objection under advisement. Both Robert and Kimberly thereafter presented a significant amount of evidence regarding their relationships with the children, the evolution of those relationships, and the role each parent played in that evolution.

[¶ 31] Based on the record before it, the trial court could have properly concluded that any direct testimony from the sons regarding their desires and their relationships with their parents was needlessly cumulative. In addition, Robert did not renew his request to call the boys as witnesses at the conclusion of the hearing. Accordingly, the court did not abuse its discretion in denying Robert an opportunity to examine his sons.

### D. Award of Parental Rights and Responsibilities

[¶ 32] Robert further argues that the trial court clearly erred in determining parental rights and responsibilities and that a rehearing on the issue of parental rights should be ordered. Robert presents a number of arguments in support of this claim, including: (1) the court did not list its findings with regards to each of the provisions of 19–A M.R.S. § 1653(3) (2007); (2) the court's consideration of his departure from the marital residence; and (3) the total weight of the evidence he presented regarding the boys' well-being since Robert departed the marital residence.

#### 1. Consideration of Section 1653 Factors

[¶ 33] "The trial court has a duty to make findings sufficient to inform the parties of the reasoning underlying its conclusions and to provide for effective appellate review." *Dargie v. Dargie*, 2001 ME 127, ¶ 2, 778 A.2d 353, 355 (quotation marks omitted). If a court denies a motion for further findings of fact where the judgment fails to set forth adequate findings on the contested issues, the court has abused its discretion. *Id.*

[¶ 34] In its judgment, the court awarded Kimberly sole parental rights and responsibilities "after taking into full consideration all of the factors set forth" in 19–A M.R.S. § 1653(3). Although the court's findings explain the basis for its award, the findings do not address every individual factor listed in section 1653, and the court declined Robert's request in his motion for additional findings pursuant to M.R. Civ. P. 52(b) that it do so.

[¶ 35] Contrary to Robert's contention, although a court is required to consider each of the factors listed in 19–A M.R.S. § 1653(3) in determining the best interest of a child, a court's decision need not address every factor. There is no value in courts robotically addressing every statutory factor solely for the sake of assuring the parties that it considered every factor, so long as it is otherwise evident that the court has evaluated the evidence with the best interest factors in mind. Here, the court's factual findings demonstrate that the court considered the best interest factors by expressly analyzing those factors most relevant under the circumstances presented by this case. Robert is entitled to no more. *See Dargie*, 2001 ME 127, ¶ 3, 778 A.2d at 355.

#### 2. Consideration of Robert's Departure from the Marital Residence

[¶ 36] Pursuant to 19–A M.R.S. § 1653(5) (2007), a court "may not consider departure from the family residence as a

factor in determining parental rights and responsibilities with respect to a minor child ... when one parent has left the family residence by mutual agreement or at the request or insistence of the other parent." In concluding that it would award Kimberly sole parental rights and responsibilities, the court took into consideration Robert's departure from the marital home. Robert alleges the court erred in doing so, claiming that his departure from the marital residence was by mutual agreement.

█ [¶ 37] Contrary to Robert's contention, the court was not compelled to find that he left the marital residence by mutual agreement or at the request or insistence of Kimberly. Robert surreptitiously "departed" the marital home, for purposes of section 1653(5), on June 22, 2005, while the children were still asleep and after Kimberly had left for work. Upon learning that Robert had left, Kimberly returned to the home later that morning and encountered Robert, who had also returned to speak with the boys. In this context, Kimberly's demand that he leave the house, after he had already moved out of the home earlier in the morning, is not the type of "request or insistence of the other parent" contemplated by section 1653(5). Accordingly, the court properly considered the effect of Robert's "sudden, unannounced departure" on the children in awarding parental rights and responsibilities, including their "deep sense of betrayal" due to Robert's previous promise, after months of family counseling, that he would not leave them again.

### 3. The Court's Ultimate Conclusion

[¶ 38] Robert contends that the court abused its discretion in awarding Kimberly sole parental rights and responsibilities given the total weight of the evidence, including Kimberly's inability to cooperate or even communicate with him regarding child care issues. He argues that by awarding Kimberly sole parental rights and responsibilities, the court condoned her refusal to cooperate during the period of the divorce, and ultimately rewarded her for this behavior.

 [¶ 39] Although it is "obviously against the best interest of the child for one parent to interfere with the child's relationship with the other parent," the court's touchstone in crafting an award of parental rights and responsibilities is the best interest of the child, not the punishment of the interfering parent. *See Hogan v. Veno*, 2006 ME 132, ¶ 20, 909 A.2d 638, 647; *see also* 19-A M.R.S. § 1653 (2007). Accordingly, a parent's failure to abide by an existing parental rights and responsibilities order is just one factor that must be considered in determining the best interest of the child. *See* 19-A M.R.S. § 1653(3).

[¶ 40] The court found that it was faced with two parties who cannot "discuss co-parenting in person at this time with any civility, and [that] vast amounts of evidence in the record shows that written co-parenting communications are no better." The court evaluated Kimberly's refusal to cooperate with Robert's parental rights in the broader context of all other relevant factors bearing on the children's best interests, including the actions Robert had engaged in that were antithetical to the best interests of his children. The court found:

> [Robert] has made several unilateral decisions concerning the children that were not in their best interests and in some instances with total disregard for their feelings. Examples of such behavior include joining them as parties to a highly publicized lawsuit [he filed] without gaining consent from, or even consulting, the mother. He took money

that he had purposely and publicly set aside to his children ... and converted that money to his own use. When ordered to return it by the Court and apologize to the children, he refused to do so, indicating in court during his testimony at trial that he had nothing to apologize about. He intentionally arranged for a news conference with the local newspaper in order to broadcast his relationship with his new girlfriend long prior to the finalization of this divorce. This publicity, together with that surrounding some of the other litigation in which he has been involved ... subjected the children to public humiliation. After his return from his first departure from the marital home with [his girlfriend], he promised his children that he would not leave them again. His sudden, unannounced departure on 22 June 2005 left with the children a deep sense of betrayal that they can . articulate clearly and painfully. These are just a few examples of self-centered behavior on his part that [has] created a gridlock of enmity within the family, paralyzing all communication and preventing healing and growth.

[¶ 41] These findings, which are supported by competent evidence in the record, establish that the court's award of sole parental rights and responsibilities to Kimberly was not intended to reward her for her refusal to cooperate with Robert. While "no court should attempt to accommodate any continuing animosity of the parents," *Hogan*, 2006 ME 132, ¶ 25, 909 A.2d at 648 (quotation marks omitted), neither should a court consider that animosity divorced from all other relevant circumstances responsible for the breakdown of a parent's relationship with his or her children. Under the extreme circumstances presented in this case, we cannot say that the court abused its discretion in awarding

sole parental rights and responsibilities to Kimberly.

E. Division of Marital Assets

[¶ 42] Robert further asserts that the court clearly erred in its valuation of the marital property and abused its discretion in dividing the property. Robert points to a number of valuations, including the value assigned to the marital home and its contents, and argues that the court abused its discretion by assigning to him a level of debt that exceeds the value of the property he was awarded. We review a divorce court's valuation of the marital property for clear error and its division of that property for an abuse of discretion. *Carter v. Carter*, 2006 ME 68, ¶¶ 13–14, 900 A.2d 200, 203.

[¶ 43] Contrary to Robert's contention, the court did not clearly err in assigning a value of $500,000 to the marital residence where the parties had agreed at an earlier stage of the divorce that the house was worth $600,000. At the final hearing, Kimberly's expert testified that the marital residence had decreased in value since the initial assessment due to a change in market conditions. The court was free to credit this testimony over the conflicting testimony of Robert's expert witness. *See Foley v. Foley*, 642 A.2d 1346, 1347 (Me. 1994) (finding that the trial court did not clearly err in relying on a real estate appraiser's valuation of marital property).

[¶ 44] Nor did the court clearly err by not setting aside $40,000 of the marital residence as a non-marital asset based on Robert's claim that he paid a portion of the mortgage using money he received as an inheritance. "[W]hen real estate is held in joint tenancy there is a presumption that it is marital [that] is rebuttable [only] on very narrow grounds." *Spooner v. Spooner*, 2004 ME 69, ¶ 18, 850 A.2d 354, 360. The court did not err in

concluding that Robert failed to rebut this presumption.

[¶ 45] The court also did not err in its valuation of the parties' personal property. The parties presented drastically different estimates regarding these assets, with Robert assigning "replacement cost value" to the property while Kimberly assigned "garage sale values." The court did not clearly err in assigning values to this property that lay between these two estimates where neither party presented expert testimony regarding the values of this property. *See Murphy v. Murphy*, 2003 ME 17, ¶ 19, 816 A.2d 814, 820 (stating that a trial court's valuation is reviewed for clear error).

[¶ 46] Although the court's distribution of property and debt results in a substantially unequal division, we cannot say that it is an inequitable one given Robert's financial misconduct, generally imprudent economic decisions following the entry of the preliminary injunction, and capacity to generate substantial future incomes.[5] The District Court did not abuse its discretion in dividing the marital estate.

F. Imputed Income

[¶ 47] Robert next alleges that the court clearly erred in finding that his earning capacity throughout the pendency of the divorce was $200,000. After detailing Robert's earning history and recent economic woes, the court stated that it "fur-

ther finds that throughout this entire period his earning capacity has been $200,000, and will use this number as the base number for child and spousal support computations."

[¶ 48] Where a party voluntarily becomes or remains unemployed or underemployed, the court need not rely on the amount the party is actually earning, but may instead calculate child support using the party's earning capacity. 19–A M.R.S. § 2001(5)(D) (2007). We review a court's decision to calculate support using a voluntarily underemployed parent's earning capacity rather than their actual income for an abuse of discretion. *Carolan v. Bell*, 2007 ME 39, ¶ 19, 916 A.2d 945, 950.

[¶ 49] In the instant case, competent evidence in the record supports the court's finding that Robert possessed an earning capacity of $200,000 throughout the divorce process. Most significantly, Robert's taxed Medicare earnings in the years immediately preceding the filing of the divorce routinely reached a level close to or in excess of $200,000. In addition, these earnings were exclusive of the variety of expenses that his law firm paid on his behalf and that were not reflected in Medicare earnings.

[¶ 50] Robert, however, argues that his earning capacity has diminished due to his legal troubles and that the court therefore clearly erred in relying on his past earn-

5. Robert is also incorrect that the court set aside to him a negative value in dividing the marital estate while assigning to Kimberly at least $387,000. In his brief, Robert incorrectly deducts $198,112 from his portion of the court's asset division based on law firm debt and the tax liability he incurred due to the court's refusal to require Kimberly to file a joint tax return during the pendency of the divorce. As part of the divorce judgment, the court awarded Robert sole ownership of his firm. In his brief, Robert lists the court's division of assets, separately listing the law firm's debts as $164,112 and the law firm's value as $20,000 in arriving at a negative award of $129,256 to $131,356. At the final hearing, however, Robert and Kimberly stipulated that the entire firm, including its debts, was worth $20,000. When the trial court expressed surprise that Kimberly would agree to such a low valuation, she responded that she did so in order to avoid exposure to any business debt Robert had not accounted for. The trial court thereafter valued the firm at $20,000, inclusive of both its assets and its substantial debts, as agreed to by Robert.

ings. Although Robert's take-home pay had recently diminished, this largely resulted from Robert's voluntary reduction in the billable hours he worked for paying clients in order to spend time litigating cases he brought on his children's behalf and to represent himself in the lawsuit brought by the two attorneys formerly with his firm,[6] his decision to reduce his hourly billing rate, and his unilateral decision to not accept his entire judicial salary.

[¶ 51] Accordingly, the court did not clearly err in finding Robert's earning capacity had been $200,000 during the divorce process and did not abuse its discretion in relying on this number in calculating his support obligations.

G. Award of Retroactive Child Support and Interim Spousal Support

[¶ 52] Robert further argues that the court erred in finding that he failed to provide any financial support to his children during the pendency of the divorce and accordingly erred in its calculation and award of child support arrearages. We review a trial court's award of child support for an abuse of discretion and its factual findings for clear error. *Foley v. Ziegler*, 2007 ME 127, ¶ 8, 931 A.2d 498, 500.

[¶ 53] As part of its final judgment, the court awarded Kimberly retroactive child support based in part on its finding that Robert had not paid any child support during the pendency of the case. It then calculated an arrearage of $43,637, based on seventy-nine weeks of payments at $552.37 per week.

[¶ 54] The court's finding regarding Robert's failure to pay any child support is factually erroneous. Although Kimber-

ly disagreed with Robert's calculation of his total payments, she asserted at the final hearing that Robert had paid $24,338.07 in child support, not including the $3100 arrearage check that she initially refused to accept. In fact, Kimberly offered an exhibit detailing each of Robert's child support payments that she admitted to receiving, which the court accepted into evidence. She also testified that Robert continued to make bi-weekly child support payments and had done so since July 11, 2005.

[¶ 55] In its interim order, the court made note of the evidentiary problems associated with determining the parties' incomes and expenses, and it reserved the right to reexamine at the time of the final hearing the amounts of the interim child support and spousal support awarded. Thus, it was within the court's discretion to revisit the issue and consider as part of the divorce judgment a retroactive modification of the interim support awards.

[¶ 56] The authority to order a retroactive modification of an interim support award must be exercised with care because the level of support established by an interim order may have influenced the parties' spending patterns and economic behavior over an extended period. The decision whether to retroactively modify an interim order at the time of the final hearing should account for all relevant factors, including: (1) the extent to which the payor complied with the prior order; (2) whether the actual needs of the recipients of the interim support were met during the divorce process from the support that was paid and other resources; and (3) the ex-

---

6. The court noted in its decision that Robert has devoted "hundreds upon hundreds of hours [of] what would otherwise be billable time" defending and prosecuting a number of cases.

tent to which the rationale for a retroactive modification—here, the court's conclusion that the payor's financial misconduct caused an artificial reduction in his or her actual earnings during the divorce—has otherwise been addressed in other portions of the divorce judgment.

[¶ 57] In this case, the court's retroactive modification of the interim child support and interim spousal support awards focused exclusively on the fact that Robert's actual earnings during the divorce were less than what the court concluded he was capable of earning. This analysis does not account for the fact that, while the divorce was pending, Robert did, in fact, make some child support payments. Most importantly, the retroactive modification did not take into account the court's separate factoring of Robert's reduced earnings and economic misconduct into its decision to award Kimberly the great majority of the marital property. Under these circumstances, the court's retroactive modification of the interim child support and interim spousal support order suffers from a factual deficit that affects the court's exercise of discretion. We therefore vacate the same and remand for the court to determine, pursuant to the July 17, 2006, interim order, the amount of interim child support and interim spousal support that was due as of the date of the entry of final judgment; the amount of payments Robert made towards these obligations; the resulting arrearage(s), if any; and the terms under which the same shall be paid.

### H. Attorney Fees

[¶ 58] Robert further contends that the court abused its discretion by ordering him to pay $50,000 of Kimberly's $56,268 attorney fees.

[¶ 59] The determination of whether to award attorney fees pursuant to 19–A M.R.S. § 105 (2007) in a domestic relations matter "is committed to the sound discretion of the trial court." *Conlogue v. Conlogue*, 2006 ME 12, ¶ 24, 890 A.2d 691, 700. Such an award should be based on all relevant factors, including the parties' relative capacity to absorb the costs of litigation. *Id.* Once a court determines that a party is entitled to an award of fees, it must then determine what sum is "reasonable." 19–A M.R.S. § 105(1); *Miele v. Miele*, 2003 ME 113, ¶ 17, 832 A.2d 760, 765. The party seeking attorney fees must, at the very least, introduce: (1) an affidavit attesting to the fee arrangement between the counsel and client; (2) the counsel's customary hourly rate; and (3) other basic facts necessary to allow the court to make a determination as to what constituted reasonable fees. *Miele*, 2003 ME 113, ¶ 17, 832 A.2d at 765. This normally entails an affidavit detailing the services performed and the hours expended during the representation. *Id.* ¶¶ 17–18, 832 A.2d at 765; Levy, *Maine Family Law* § 9.2 at 9–5 (5th ed. 2006).

[¶ 60] Here, the District Court found that Robert made "unrestrained and frequently intemperate filings" that "ignored the tenets of common practice in this State" and that these pleadings "generated excess fees on [Kimberly's] part" that Robert should have to pay for. The court then ordered Robert to pay $50,000 of Kimberly's counsel fees of $56,268.

[¶ 61] The fee affidavit submitted by Kimberly's attorney merely reported the total hours billed each month, but did not report the attorney's customary hourly rate and provided no itemization of the services that were performed. Such information is required in order for a court to determine whether a party's fee request

is reasonable.[7] Accordingly, we vacate the fee award.

## I. Bias

[¶ 62] Finally, Robert contends that the court abused its discretion in denying his motion for recusal, claiming a variety of facts demonstrate sufficient bias to not only warrant recusal, but also to vacate the judgment. We review a trial court's decision regarding a motion for recusal for an abuse of discretion. *Gauthier v. Gauthier*, 2007 ME 136, ¶ 8, 931 A.2d 1087, 1090.

[¶ 63] Robert first alleges that some time prior to the November 2006 hearing, the trial judge made a disparaging comment regarding the size of the court file in this case to an attorney who was not involved in the case. A party seeking recusal must make a timely motion to disqualify a judge, preferably as soon as the party gains knowledge of the facts suggesting recusal. *Id.* ¶ 10, 931 A.2d at 1091. Although Robert became aware of this purported comment shortly after the hearing, he did not file a motion for recusal until over six months later, after the final judgment was issued. Accordingly, Robert's motion was untimely with respect to the alleged ex parte comment.

[¶ 64] Robert next cites the court's failure to act on a number of important motions filed during the pendency of the divorce. Again, a party may not take a chance on gaining a favorable decision and then, if the decision is unfavorable, raise grounds for recusal previously known. *Id.* Accordingly, Robert's motion was untimely as to this ground as well.

[¶ 65] Robert also points to the court's inclusion in its judgment of a list of fourteen separate lawsuits in which Robert or his firm had appeared as a party in the years immediately preceding the divorce. He notes that neither he nor Kimberly introduced evidence regarding a number of these cases. Because, however, the Maine Rules of Evidence permit a trial court to take judicial notice of such facts, *see* M.R. Evid. 201(b), and Robert does not contest the court's failure to grant him an opportunity to be heard on this issue, *see* M.R. Evid. 201(e), the court's action did not constitute bias or other error.

[¶ 66] Finally, Robert contends that the court's criticism of him in its findings rises to a sufficient level to constitute bias. The court's findings that were critical of Robert were based on competent evidence, are not clearly erroneous, and do not establish improper bias. In addition, the record reflects that the trial judge demonstrated even handedness and patience with both parties throughout a highly contentious trial process.

The entry is:

Judgment vacated regarding retroactive child support, retroactive spousal support, and attorney fees. Case remanded to the District Court for further proceedings consistent with this opinion. Judgment affirmed in all other respects. Kimberly Nadeau's request for sanctions for a frivolous appeal is denied.

---

**7.** To the extent a party claims that the disclosure of such information to the opposing party will be prejudicial, the party may move the court to review portions of the information in camera.