MAINE SUPREME JUDICIAL COURT                Reporter of Decisions
Decision:    2025 ME 38
Docket:      Pen-23-294
Argued:      March 5, 2024
Decided:     April 29, 2025

Panel:       STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ., and
             HUMPHREY, A.R.J.
Majority:    MEAD, HORTON, and LAWRENCE, JJ., and HUMPHREY, A.R.J.
Dissent:     DOUGLAS, J., and STANFILL, C.J., and CONNORS, J.

KATERYNA A. BAGRII

v.

JOHN P. CAMPBELL et al.

HORTON, J.

[¶1]  Kateryna A. Bagrii appeals from a judgment of the District Court (Newport, *Ociepka, J.*) dismissing, for lack of standing, her complaint under the Maine Parentage Act seeking to establish herself as a de facto parent of two children whose biological parents are John P. Campbell and Jie Chen.  *See* 19-A M.R.S. §§ 1831, 1891 (2025).  Bagrii challenges the court's factual findings and asks us to alter our holding in *Martin v. MacMahan*, 2021 ME 62, ¶¶ 29-31, 264 A.3d 1224, to enable her to obtain standing without having to establish Chen's explicit or implicit consent to Bagrii's parental role.  Bagrii also requests that we exercise our *parens patriae* authority to recognize her standing in the

circumstances of this case. We affirm the judgment dismissing Bagrii's complaint for lack of standing.

## I. BACKGROUND

[¶2] The District Court found the following facts, and there is competent evidence in the record to support them. *See Martin*, 2021 ME 62, ¶¶ 24, 33, 264 A.3d 1224. Campbell is a United States citizen, and Chen is a citizen of China. Campbell and Chen met in 2011, when Campbell was living and working in China. Chen was about twenty-two years old at the time.

[¶3] Chen became pregnant with their first child in 2012 at a time when she did not feel ready to be a parent. Chen and Campbell began living together late during the pregnancy, and the child was born in February 2013. Campbell had to leave China because of an expiring teaching visa. He took a job in Ukraine, returning periodically to stay with Chen and the child in China. Chen became pregnant again about six months after the first child's birth. She believed that she and Campbell would raise their children together as a family.

[¶4] In November 2013, Bagrii, a Ukrainian citizen, became one of Campbell's English-language students in Ukraine. The two began a romantic relationship that Campbell concealed from Chen.

[¶5] Chen and Campbell's second child was born in April 2014, at a time when China had a strict one-child policy that imposed harsh penalties on families with more than one child. Campbell was adamant that his children would not grow up in China, and he made plans to remove them from the country. He and Chen did not reach an agreement about who would raise the children.

[¶6] During the summer of 2014, Campbell and Bagrii continued their relationship in Ukraine and discussed living together and bringing Campbell's two children to live with them in Ukraine. Campbell visited China and brought his older child back to Ukraine with him in September 2014. Two months later, he brought his younger child to Ukraine.

[¶7] Chen had not voluntarily consented to the children's removal from China. She had hidden with the children at her mother's home to try to prevent Campbell from taking them. Campbell called on police authorities and the United States Consulate in China to find the children. Chen was under threat of penalties due to the one-child policy, and Campbell forced her to let the children leave with him. Chen felt scared and helpless and had no other options. Throughout their relationship, Campbell had been controlling and verbally

abusive, and his behavior caused Chen to fear him. She often kept silent to avoid upsetting him.

[¶8] After Campbell forcibly removed the children from China, he and Bagrii formed a family, which included Campbell and Chen's two children and Bagrii's two children from a previous marriage. Campbell told Bagrii that Chen was too young to be a mother and that China was not a good environment for Chen and Campbell's children. Bagrii breastfed Chen and Campbell's children and acted as their mother.

[¶9] From late 2014 to mid-2015, Campbell and Bagrii moved back and forth from Ukraine to the country of Georgia. Bagrii had been a doctor of cardiology in Ukraine but did not work during that time. She took care of the children with Campbell. Any time that Campbell had to be out of the country he gave Bagrii power of attorney to make decisions for his two children. Campbell maintained some contact with Chen after he took custody of the children, but around the middle of 2015 Campbell told Chen not to contact him anymore.

[¶10] Campbell and Bagrii were married on March 17, 2015, during a trip to San Diego, California. In January 2016, they moved with the children to Westport, New York. Bagrii continued to act as the children's mother and began

nursing school. She had to start anew in her education because her qualifications from Ukraine were not recognized in the United States. Campbell and Bagrii had two children together. In 2018, Campbell, Bagrii, and the six children moved to Levant, Maine. Bagrii continued with her education, earning her associate's degree and a bachelor's degree. She is on track to earn her master's degree.

[¶11] Chen and Campbell's children called Bagrii "Mom" and had regular contact with Bagrii's parents in Ukraine through Skype. Bagrii considered them her children. She cooked for them, helped them with their homework, and comforted them when they were ill, whether or not Campbell was present.

[¶12] By 2019, the relationship between Campbell and Bagrii had begun to deteriorate. Campbell said he wished Bagrii would die in a car accident or return to Ukraine. Bagrii left Campbell on April 30, 2020, and for the first time contacted Chen about Chen's children. Chen had not known where the children were from the middle of 2015 until Bagrii's contact in April 2020. Campbell had occasionally sent Chen brief updates by email, but Chen knew only that the children were overseas.

[¶13] In Bagrii's conversation with Chen, Bagrii said that she did not think Campbell could care for the children safely. She was concerned about his

6

mental and physical health, financial stability, and ability to care for the children's needs. The children were about seven and six years old at that time.

[¶14] Campbell prohibited any contact between Bagrii and the children from that point forward. Campbell and Bagrii filed complaints for protection from abuse against each other, but the complaints were ultimately dismissed.

[¶15] In early 2020, concerns were raised that Bagrii used physical discipline with the children, that one of her older children posed a safety issue to the younger children, and that Campbell might not be able to parent and care for the children. Neither of Campbell and Chen's two children has indicated a strong desire to see Bagrii—they have made statements that she was "mean." Bagrii has primary residence of her and Campbell's children, and Campbell has rights of contact.

[¶16] Chen has taken active steps to reconnect with her two children. She has had two in-person visits with them in the United States and has had video communications with them from China. She has a ten-year visitor visa that allows her to stay in the United States for up to 180 days at a time. She is moving to Switzerland, with a goal to facilitate easier contact with the children given that Campbell will not agree to allow the children to visit Chen in China.

[¶17]   On October 27, 2021, Bagrii filed a complaint seeking a determination that she is a de facto parent of Chen and Campbell's two children. She attached an affidavit in support of her complaint averring that she had functioned as the children's parent since 2014; that they have called her "Momma" throughout their lives; that Campbell fostered and supported her parental relationship with the children; that she has accepted full, permanent parental responsibility for them without the expectation of compensation; and that her continued relationship with the children is in their best interests. Campbell and Chen each answered and opposed the recognition of Bagrii as a de facto parent.  On June 7, 2022, the court (*Chandler, M.*) appointed a guardian ad litem, with no objection from any party.[1]

[¶18]  Bagrii moved for the court to hold an interim hearing on whether Bagrii could have contact with Chen and Campbell's two children while the matter was pending.  Chen and Campbell objected.  The family law magistrate (*Laskey, M.*) ordered that the complaint be submitted to a judge for a preliminary determination of standing.

---

[1] Although no party raises the issue, de facto parentage cases, *see* 19-A M.R.S. § 1891 (2025), are not among the case types in which a statute authorizes the appointment of a guardian ad litem.  *See* 19-A M.R.S. § 1507(1) (2025) (authorizing a court to appoint a guardian ad litem "[i]n contested proceedings under sections 904 [orders pending divorce], 1653 [parental rights and responsibilities] and 1803 [petition for grandparent and great-grandparent visitation] in which a minor child is involved.").  It is clear from the guardian ad litem's report that he was also appointed in a separately pending parental rights matter between Chen and Campbell.

8

[¶19]   After the court (*Faircloth, J.*) held a status conference in March 2023, the court (*Ociepka, J.*) held an evidentiary hearing both on the issue of standing and on the de facto parentage complaint on July 7, 2023.  The court heard testimony from Bagrii, Chen, and Campbell, and admitted the guardian ad litem's report, which recommended against granting Bagrii contact with the children because the children did not want it and had disclosed physical abuse by Bagrii and inappropriate conduct by one of her children.

[¶20]   The court entered a judgment on August 8, 2023, dismissing Bagrii's complaint for lack of standing based on a finding that, although Bagrii proved by a preponderance of the evidence all other elements for de facto parentage, including that Campbell consented to Bagrii's parenting of the children, Bagrii did not meet her burden of demonstrating by a preponderance of the evidence that Chen fostered and supported her relationship with the children or understood, acknowledged, or accepted Bagrii's assumption of a parental role.  *See Davis v. McGuire*, 2018 ME 72, ¶ 26, 186 A.3d 837.  Because of the dismissal, the court denied Bagrii's motion for an interim order.  Bagrii timely appealed.  *See* 19-A M.R.S. § 104 (2025); 14 M.R.S. § 1901 (2025); M.R. App. P. 2B(c)(1).

## II. DISCUSSION

[¶21]  Bagrii argues that our analysis in *Martin*, 2021 ME 62, 264 A.3d 1224, is at odds with the plain language of the statute and that her own circumstances demonstrate how a person can be a de facto parent without the consent of all parents who appear in a case.  She also argues that she has standing even under *Martin* because the evidence shows that Chen implicitly consented to Bagrii's parental role.  Finally, she contends that we should—notwithstanding the de facto parentage statute—vacate the dismissal of Bagrii's complaint and remand the matter for the court to exercise its *parens patriae* authority in the children's best interests.

### A.    Statutory Interpretation and Due Process

[¶22]  "A proceeding to adjudicate the parentage of a child," including de facto parentage, is brought under the Maine Parentage Act.  19-A M.R.S. § 1834 (2025); *see id.* § 1891.  "[A] party who files a complaint to be adjudicated a de facto parent of a child must make an initial showing of standing . . . ."  *Davis*, 2018 ME 72, ¶ 13, 186 A.3d 837; *see* 19-A M.R.S. § 1891(2).  "The requirement of a preliminary showing of standing is a function of the principle that a parent has a fundamental right to raise his or her child"—a right that may be infringed

upon if a person must expend resources to defend against a third party's claim of de facto parenthood. *Davis*, 2018 ME 72, ¶¶ 13-14, 186 A.3d 837.

[¶23] With respect to standing, the Act ordinarily requires the court to determine, on the basis of the parties' pleadings and affidavits, "whether the person seeking to be adjudicated a de facto parent has presented prima facie evidence of the requirements set forth in subsection 3." 19-A M.R.S. § 1891(2)(C); *see id.* § 1891(2)(A), (B). The court may, however, "if necessary and on an expedited basis, hold a hearing to determine disputed facts that are necessary and material to the issue of standing." 19-A M.R.S. § 1891(2)(C). The court employed this process here.

[¶24] A party must establish standing by a preponderance of the evidence, whereas a final determination of de facto parentage requires proof by clear and convincing evidence. *See Davis*, 2018 ME 72, ¶ 26, 186 A.3d 837; 19-A M.R.S. § 1891(3). For a person to be declared a de facto parent, the person must have

> fully and completely undertaken a permanent, unequivocal, committed and responsible parental role in the child's life. Such a finding requires a determination by the court that:
>
> > **A.** The person has resided with the child for a significant period of time;

**B.** The person has engaged in consistent caretaking of the child;

**C.** A bonded and dependent relationship has been established between the child and the person, *the relationship was fostered or supported by another parent of the child and the person and the other parent have understood, acknowledged or accepted that or behaved as though the person is a parent of the child*;

**D.** The person has accepted full and permanent responsibilities as a parent of the child without expectation of financial compensation; and

**E.** The continuing relationship between the person and the child is in the best interest of the child.

19-A M.R.S. § 1891(3) (emphasis added).

[¶25] In interpreting section 1891(3)(C) in *Martin*, 2021 ME 62, ¶¶ 24, 28-29, 264 A.3d 1224, we examined de novo the legal question of whether, to avoid an unconstitutional result, we had to read the de facto parentage statute to require *all* parents to have "understood, acknowledged or accepted that or behaved as though the person is a parent of the child," 19-A M.R.S. § 1891(3)(C). Because "the parents' fundamental right[s] to direct the upbringing of their children" are substantially infringed upon when another person is established as a de facto parent, we applied strict scrutiny to determine whether section 1891(3)(C) comported with constitutional due process principles. *Martin*, 2021 ME 62, ¶ 25, 264 A.3d 1224. We held that "a putative de facto parent must

prove the elements of section 1891(3)(C) as to a legal parent who appears and objects to the de facto parentage petition." *Id.* ¶ 29.

[¶26] That requirement prevents the "unilateral actions of one legal parent" from causing "an unconstitutional dilution of another legal parent's rights." *Id.* However, *Martin* does not require proof that all parents have expressly consented to the putative de facto parent's parental role. *See id.* ¶ 31. A plaintiff can acquire de facto parental rights by demonstrating that the legal parent or parents appearing in a case "have implicitly, through acts or omissions if not through words, fostered, supported, and accepted the person's parental role." *Id.*; *see also id.* ¶ 33 (affirming a judgment establishing de facto parenthood in a couple when the objecting parent had at least implicitly accepted the couple's parental role by expressing appreciation for them raising his children and by granting them temporary legal authority over the children). By abandoning the child or otherwise abdicating parental rights and responsibilities, a legal parent may be deemed to have acknowledged and accepted a de facto parent's role. *See id.* ¶¶ 31-33. Our approach "raises fewer constitutional issues" than an approach that requires consent from only one parent. Jessica Feinberg, *The Boundaries of Multi-Parentage*, 75 SMU L. Rev. 307, 349 (2022).

[¶27]  Here, both Campbell and Chen appeared and argued and testified that they objected to Bagrii having status as a de facto parent.  Bagrii therefore had to prove that both Campbell and Chen "understood, acknowledged or accepted that or behaved as though [she was] a parent of the child."  19-A M.R.S. § 1891(3)(C); *see Martin*, 2021 ME 62, ¶ 29, 264 A.3d 1224.  The court found that she had not satisfied her burden of proof as to Chen.

[¶28]  Although Bagrii argues that the statute should be applied differently because of how many years she spent caring for the children at issue, we are not persuaded to abandon or modify our recent decision in *Martin*.  The court's findings regarding Campbell's actions demonstrate how, after a child's legal parents end their relationship, one parent may try to exclude the other from a parental role, sometimes to enable a stepparent to take over.  The record includes evidence that after bringing the children to Ukraine, Campbell explicitly proposed to Bagrii that she replace Chen as the children's mother, and Bagrii readily agreed.  Family court judges regularly encounter situations in which one parent has a consuming goal, after a divorce or separation, to displace the other parent in the life of the child, often in favor of a new partner or spouse.  Such conduct cannot be squared with the child's best interest or the fundamental constitutional rights of the other parent, *see Martin*, 2021 ME 62,

¶ 29, 264 A.3d 1224, if that parent is able and willing to exercise parental rights and responsibilities cooperatively and safely.[2]  Moreover, a statute provides that "[n]either parent has any rights paramount to the rights of the other with reference to any matter affecting their children." 19-A M.R.S. § 1651 (2025).  It follows from that precept that neither parent has any inherent right to consent to a third party becoming a de facto parent over the objection of the other parent.  Chen has done nothing that would justify a court order compelling her to share parental rights and responsibilities with Bagrii, whom she had never even met before these proceedings.  For us to alter our *Martin* analysis as Bagrii asks would validate and even incentivize conduct like Campbell's, which would be contrary to the purposes of our statutes governing parental rights and responsibilities, *see supra* n.2, and would raise constitutional concerns.

---

[2]  Several of the statutory best interest factors favor a parent who promotes the other parent's active involvement in the child's upbringing. *See* 19-A M.R.S. § 1653(3)(H), (I), (J) (2025) (requiring consideration of "[t]he capacity of each parent to allow and encourage frequent and continuing contact between the child and the other parent, including physical access," "[t]he capacity of each parent to cooperate or to learn to cooperate in child care," and "[m]ethods for assisting parental cooperation and resolving disputes and each parent's willingness to use those methods").  The Legislature has made clear the shared legal rights and responsibilities of children's biological parents, stating that "except when a court determines that the best interest of a child would not be served, it is the public policy of this State to assure minor children of frequent and continuing contact with both parents after the parents have separated or dissolved their marriage and to encourage parents to share the rights and responsibilities of child rearing in order to effect this policy." *Id.* § 1653(1)(C). "The parents are the joint natural guardians of their minor children and are jointly entitled to the care, custody, control, services and earnings of their children.  Neither parent has any rights paramount to the rights of the other with reference to any matter affecting their children." 19-A M.R.S. § 1651 (2025); *see also* 19-A M.R.S. § 1652 (2025) (establishing a parent's obligation to provide financial support for a child).

[¶29]  Nonetheless, the dissent would overrule *Martin* and remand the matter for a full hearing on Bagrii's complaint, despite the court's undisputed findings that Bagrii had not seen the children for more than a year before she filed her complaint and that the children did not wish to see her.  *See* Dissenting Opinion ¶ 62.  These findings, and the guardian ad litem's report recommending against allowing Bagrii contact with the children due in part to a risk posed by one of her children, strongly undermine Bagrii's position that the trial court's application of the rule we announced in *Martin* is unfair and requires a remand.

[¶30]  The dissent's emphasis on the best interest of the child is well-taken, but enabling a child to maintain a connection with a third party to whom the child has become emotionally attached need not result in the permanent infringement of constitutional parental rights that an award of de facto parent status entails.  *See* Dissenting Opinion ¶¶ 47, 50-51; *Pitts v. Moore,* 2014 ME 59, ¶ 27, 90 A.3d 1169 ("[T]he establishment of parental rights is no less permanent than the termination of parental rights . . . .").  Maine's statute on parental rights and responsibilities permits a court to "award reasonable rights of contact with a minor child to a 3rd person."  19-A M.R.S. § 1653(2)(B) (2025).  Rights of contact are not necessarily permanent and can be crafted to diminish over time and terminate.  Here, if the children had wished

to see Bagrii, and if either parent agreed that she should have reasonable contact with the children, an award of some contact for some period might have been justified. *See id.*

[¶31] In arguing that the court erred in dismissing her complaint, Bagrii points out that the burden to establish standing is lower than the burden to establish de facto parentage. However, the difference lies in the standard of proof, not in the elements that must be proved. *See Davis*, 2018 ME 72, ¶ 26, 186 A.3d 837. If a party cannot establish each element of de facto parentage by a preponderance of the evidence for purposes of standing, the party necessarily will be unable to establish de facto parent status by clear and convincing evidence. *See id.*

## B. Review of the Findings of the Trial Court

[¶32] We turn to whether the court erred in finding that Chen had not explicitly or implicitly consented to Bagrii's assumption of a parental role with respect to Campbell and Chen's two children. When, as here, the court holds an evidentiary hearing on the issue of standing, the court must find facts by a preponderance of the evidence. *See id.* ¶¶ 15-16, 26. We review the findings of the court for clear error. *Martin*, 2021 ME 62, ¶ 24, 264 A.3d 1224. Because Bagrii had the burden of proof, we will not vacate the trial court's judgment

unless the record compels a finding in Bagrii's favor on each element of standing. *See In re Child of Philip S.*, 2020 ME 2, ¶ 14, 223 A.3d 114; *see also* 19-A M.R.S. § 1891(2)(C), (3).

[¶33] The trial court found, with evidentiary support, that Chen did not want her children to be separated from her and that she did not know where they were after Campbell ceased meaningful communication with her in 2015. Given these facts, the court was not compelled to find that Chen "understood, acknowledged or accepted that or behaved as though [Bagrii was] a parent of the child." 19-A M.R.S. § 1891(3)(C). Accordingly, the court did not err in dismissing Bagrii's complaint for lack of standing under the Maine Parentage Act.

## C. *Parens Patriae*

[¶34] Bagrii lastly seeks to have Maine courts exercise their *parens patriae* authority under the common law. In doing so, Bagrii misses the point of our holding in *Martin*. We held that *constitutional due process principles* require a putative de facto parent to "prove the elements of section 1891(3)(C) as to a legal parent who appears and objects to the de facto parentage petition." *Martin*, 2021 ME 62, ¶¶ 25, 29, 264 A.3d 1224 (footnote omitted). Neither we nor the District Court have any greater authority to act in contravention of due

process in exercising our "*parens patriae* authority on behalf of the child," *Davis v. Anderson*, 2008 ME 125, ¶ 19, 953 A.2d 1166 (quotation marks omitted), than we would in exercising our authority under the Maine Parentage Act. Because due process requires proof that Bagrii's relationship with the children was fostered or supported by Chen and the trial court found such proof lacking, we affirm the judgment dismissing Bagrii's complaint.[3]

The entry is:

> Judgment affirmed.

---

DOUGLAS, J., with whom STANFILL, C.J., and CONNORS, J., join, dissenting.

[¶35] I disagree with the Court's resolution of this case and therefore respectfully dissent. The purpose of a standing requirement is "to ensure that only legitimate cases of de facto parenthood proceed." *Young v. King*, 2019 ME 78, ¶ 25, 208 A.3d 762 (Jabar, J., concurring). Bagrii presents such a case and has met the threshold standing requirement in the Maine Parentage Act of demonstrating that she had "fully and completely undertaken a permanent,

---

[3] Because Campbell has prevailed on appeal, we do not address his argument—raised in case of remand—that the trial court should have admitted additional evidence regarding an investigation by the Department of Health and Human Services.

unequivocal, committed and responsible parental role" in the lives of the children. 19-A M.R.S. § 1891(3) (2025).

## I. BACKGROUND

[¶36] For over five and one-half years Bagrii and her husband, John Campbell, "formed a family" that included her two children from a prior marriage and his two children—ages twenty-one months and six months, respectively. The District Court found that Bagrii "*was* [the children's] *parent* . . . and acted accordingly: making sure their needs were met and caring for them on a daily basis, including full time care at times when [Campbell] was away." Bagrii nurtured the children and attended to their needs from the outset, even breastfeeding them when they were infants. Over the years she cooked their meals, bathed them, put them to bed, read them bedtime stories, helped them with homework, arranged their medical appointments, brought them for haircuts, and took them shopping—all the things that committed, responsible, and caring parents naturally do for their children. The children called Bagrii "Mom." They knew and interacted regularly (albeit via Skype) with Bagrii's parents in Ukraine. The District Court found by a preponderance

of the evidence[4] that Bagrii had a "bonded relationship with the children and that a continuing relationship would be in their best interest."

[¶37] Despite effectively meeting all other requirements in 19-A M.R.S. § 1891(3),[5] the court denied standing, ruling that "[b]ecause both [Campbell] and [the biological mother] appeared and objected to [Bagrii's] petition, she must prove that *both* parents 'fostered or supported' a parental relationship with [the children] and that they *both* 'understood, acknowledged or accepted that or behaved as though' [Bagrii] was the children's parent."

[¶38] In so ruling, the court was following our decision in *Martin v. MacMahan*, which interpreted section 1891(3)(C)'s requirement that the bonded relationship between a child and a person claiming de facto parent status be "fostered or supported by another parent," 19-A M.R.S. § 1891(3)(C), to mean, as applied here, that *both* Campbell *and* the children's biological mother must have consented, either expressly or impliedly, to the formation of

---

[4] The Parentage Act provides that courts determine standing based on "whether the person seeking to be adjudicated a de facto parent has presented *prima faci*e evidence of the requirements set forth in [section 1891(3)]." 19-A M.R.S. § 1891(2)(C) (2025) (emphasis added). This Court, however, now requires a higher quantum of proof to support standing, namely proof by a preponderance of evidence. *Davis v. McGuire*, 2018 ME 72, ¶ 26, 186 A.3d 837; s*ee also infra* n.17.

[5] The District Court also found by a preponderance of the evidence that Bagrii "resided with [the children] for a 'significant period of time,'" *see* 19-A M.R.S. § 1891(3)(A), and "engaged in consistent caretaking of [the children]," *see id*. § 1891(3)(B). As noted above, the court further found that she "has a bonded relationship with the children," *see id.* § 1891(3)(C); and that "a continuing relationship would be in their best interest," *see id.* § 1891(3)(E).

the relationship.[6] *Martin v. MacMahan*, 2021 ME 62, ¶ 29, 264 A.3d 1224 ("To hold otherwise would potentially allow the unilateral actions of one legal parent to cause an unconstitutional dilution of another legal parent's rights.").

[¶39] Bagrii invites us to reconsider *Martin*'s interpretation of section 1891(3)(C), which she contends is contrary to the statute's plain language. The Court has declined to do so, saying that *Martin*'s interpretation "raises fewer constitutional issues" and guards against the prospect that one parent "may try to exclude the other from a parental role, sometimes to enable a stepparent to take over." Court's Opinion ¶¶ 26, 28 (quotation marks omitted). I would accept the invitation to revisit *Martin* because, in my view, its interpretation of section 1891(3)(C) is contrary to the statute's plain language, inconsistent with legislative policies central to the Maine Parentage Act, and unnecessary to avoid constitutional infirmity.[7]

---

[6] *Martin* itself did not involve the issue of standing, which apparently had been agreed to by the parties at trial. *See Martin v. MacMahan*, 2021 ME 62, ¶ 13, 264 A.3d 1224. The statutory elements in section 1891(3)(C) apply to both the threshold issue of standing and the ultimate determination on the merits, with the latter requiring proof by clear and convincing evidence. 19-A M.R.S. § 1891(2)(C), (3).

[7] Even though *Martin* was decided only four years ago, the doctrine of *stare decisis* should not preclude revisiting the case. *See Finch v. U.S. Bank, N.A.*, 2024 ME 2, ¶¶ 41-47, 307 A.3d 1049 (identifying concisely five factors for determining whether overruling a prior decision is warranted: (1) whether the decision is consistent with the express language of the statute and our long standing legal principles; (2) whether the decision is contrary to the weight of authority in other jurisdictions; (3) whether the decision is workable or produces a logical result; (4) whether revising the decision will upset settled expectations; and (5) whether the decision promotes sound public policy). Without undertaking a full-fledged *stare decisis* analysis here, I note the following. With respect to the first

22

## II. DISCUSSION

## A.  Statutory Considerations

## 1.  Plain Language

[¶40]  *Martin*'s interpretation of section 1891(3)(C) is obviously at odds with the Act's plain language.  Section 1891(3)(C) requires a person seeking de facto parent status to demonstrate that

> [a] bonded and dependent relationship has been established between the child and the person [claiming de facto parent status],

factor, as discussed herein, *Martin*'s interpretation of section 1891(3)(C) is at odds with the statute's plain language.  As to the second factor, there is a division of authority on the question of whether both parents must have consented to the relationship between the putative de facto parent and child, but a number of courts as well as family law scholars and other authorities do not support such a position.  *Compare E.N. v. T.R.*, 255 A.3d 1, 31 (Md. 2021) (holding that consent of both parents for a de facto parent relationship is constitutionally required); *K.W. v. S.L.*, 157 A.3d 498, 507 (Pa. Super. Ct. 2017) (reversing trial court's finding that a third party in *loco parentis* had standing where only one legal parent consented to the relationship), *with In re L.J.M.*, 476 P.3d 636, 645 (Wash Ct. App. 2020) (interpreting the state's de facto parentage statute to require consent of only one parent); *K.A.F. v. D.L.M.*, 96 A.3d 975, 982-983 (N.J. Super Ct. App. Div. 2014) (holding where at least one "legal parent" of a child consents, the third party has standing to pursue a claim for a psychological parent relationship); Douglas NeJaime, *Parents in Fact,* 91 U. Chi. L. Rev. 513, 544 (2024) ("The requirement that a legal parent consented to the de facto parent's formation of a parent-child relationship makes less sense, from a constitutional perspective, as we begin to see the de facto parent simply as a *parent*—like any other parent."); Jeffery A. Parness, *The Constitutional limits on Custodial and Support Parentage by Consent*, 56 Idaho L. Rev. 421, 442-43 (2020) (interpreting the "another parent" language from the Uniform Parentage Act's de facto parentage statute to not require consent of all existing legal parents); Jessica Feinberg, *The Boundaries of Multi-Parentage*, 75 SMU L. Rev. 307, 349 (2022) (explaining "due to the paramount importance of children's best interests, it is neither necessary nor desirable for parentage establishment through equitable parenthood doctrines to require the express consent of each of the existing legal parents").  The Uniform Parentage Act (2017) requires only that "another parent of the child fostered or supported the bonded and dependent relationship." *Unif. Parentage Act* § 609, 9B U.L.A. 80 (2017).  With respect to the remaining factors, reconsidering *Martin*'s interpretation of section 1891(3)(C) would produce a workable, reasonable, and logical result by re-aligning standing requirements with their intended purpose—to screen out unfounded claims—and allow consideration of legitimate claims on their merits.  Reading section 1891(3)(C) as plainly written and intended would not upset settled expectations or reliance interests, particularly given that *Martin* was so recently decided.  Further, it would promote rather than impede policies adopted by the Legislature in the Maine Parentage Act as I discuss here.

> the relationship was fostered or supported by *another parent* of the child and the person and *the other parent* have understood, acknowledged or accepted that or behaved as though the person is a parent of the child.

19-A M.R.S. § 1891(3)(C) (emphasis added). There is no ambiguity here. The phrases "*another* parent" and "*the* other parent" clearly refer to a single individual—one parent. The Legislature clearly intended that a putative de facto parent satisfies the "parental support" requirement in section 1891(3)(C) by demonstrating that one of the legal parents—"*another parent*"— of the child at issue had fostered or supported the parent-child relationship. *See Wawenock, LLC v. Dep't of Transp.*, 2018 ME 83, ¶ 7, 187 A.3d 609 ("The first and best indicator of legislative intent is the plain language of the statute itself."). *Martin*'s interpretation not only conflicts with the statute's plain language but it is also out of sync with legislative policies embedded in the Act.

## 2. Legislative Policies

[¶41] When it comes to setting policy in the area of family law, we have stated unequivocally that in light of "the evolving compositions of families," we look to the Legislature because "[p]arenthood is meant to be defined by the Legislature, steeped as it is in matters of policy requiring the weighing of multiple viewpoints." *Pitts v. Moore*, 2014 ME 59, ¶ 18, 90 A.3d 1169 (emphasizing "again" that the issue of defining parentage, and in particular

de facto parentage, "would be best addressed by the Legislature"). In 2016, the Legislature enacted the Maine Parentage Act, "an updated, comprehensive statutory framework for determining a child's legal parentage." L.D. 1017, Summary (127th Legis. 2015); *see* P.L. 2015, ch. 296 (effective July 1, 2016) (codified at 19-A M.R.S. §§ 1831 *et seq.*) The Act establishes de facto parent status as one of eight discrete types of legal parentage, all standing in parity with one another. *See* 19-A M.R.S. § 1851 (2025); *Pitts*, 2014 ME 59, ¶ 30, 90 A.3d 1169.[8] Reading *Martin*'s requirement for the second parent's consent into section 1891(3)(C)—*especially as the sole basis for denying standing, as was the case here*—conflicts with two important policy objectives reflected in the Legislature's express recognition, and adoption, of de facto parenthood.

---

[8] **1851. Establishment of parentage**

Parentage may be established by:

1. **Birth.** Giving birth to the child, except as otherwise provided in subchapter 8;
2. **Adoption.** Adoption of the child pursuant to Title 18-C, Article 9;
3. **Acknowledgement.** An effective voluntary acknowledgement of parentage under subchapter 3;
4. **Presumption.** An unrebutted presumption of parentage under subchapter 4;
5. **De facto parentage.** An adjudication of de facto parentage under subchapter 5;
6. **Genetic parentage.** An adjudication of genetic parentage under subchapter 6;
7. **Assisted reproduction.** Consent to assisted reproduction under subchapter 7; and
8. **Gestational carrier agreement.** Consent to a gestational carrier agreement under subchapter 8 by the intended parent or parents.

19-A M.R.S. § 1851 (2025). The Act defines "parentage" as "the legal relationship between a child and a parent as established in this chapter [61]." 19-A M.R.S. § 1832(14) (2025).

[¶42]  First, it diminishes the status of de facto parenthood itself as an independent ground for legal parentage.  A person claiming de facto parent status is not just any third party seeking "to obtain parental rights through litigation[] over the objection[] of [a] [legal] parent[]."  *Martin*, 2021 ME 62, ¶ 25, 264 A.3d 1224 (quotation marks omitted).  The Legislature has determined that, for compelling policy reasons that I discuss here, individuals who satisfy the requirements of section 1891(3) acquire permanent, legal parental status with respect to a child—a status that stands on "equal footing" with a child's other legal parents.  *See* 19-A M.R.S. § 1853(1) (2025) ("Unless parental rights are terminated, parentage established under this chapter applies for all purposes, except as otherwise specifically provided by other law of this State."); *Pitts*, 2014 ME 59, ¶ 30, 90 A.3d 1169 ("A determination that a person is a de facto parent means that he or she is a parent on equal footing with a biological or adoptive parent, that is to say, with the same opportunity for parental rights and responsibilities.").

[¶43]  Thus, "once a party is determined to be a de facto parent, he or she has the same fundamental rights as the biological or adoptive parent," *In re K.S.*, 2014 ME 71, ¶ 6, 93 A.3d 687, and is "a parent for all purposes," *Pitts*, 2014 ME 59, ¶ 32, 90 A.3d 1169.  As applied here, *Martin*'s interpretation of section

1891(3)(C) effectively "elevates the rights of the biological [parent] at a time when . . . the complexities of the modern family render biological ties less relevant in identifying familial relationships," *id.* ¶ 52 (Jabar, J., concurring), and conflicts with clear legislative policy to the contrary. When *Martin*'s second-parent-consent requirement operates as the only basis for denying standing, it stifles full consideration of the merits of a de facto parentage claim.

[¶44] Second, it negates the policy of protecting a child's welfare achieved by preserving a stable, psychologically dependent, emotionally significant relationship that has formed with the person functioning as the child's parent in an established family unit. De facto parentage is a species of functional parenthood, which is based not on a biological connection but rather on the actual, day-to-day functioning of a parent figure from which a "bonded and dependent relationship" develops. 19-A M.R.S. § 1891(3)(C); *see V.C. v. M.J.B.*, 748 A.2d 539, 550 (N.J. 2000) (noting that "[a]t the heart of [de facto] parent cases is a recognition that children have a strong interest in maintaining the ties that connect them to adults who love and provide for them"); Courtney G. Joslin & Douglas NeJaime, *How Parenthood Functions*, 123 Colum. L. Rev. 319, 329-30 (2023) (providing examples of functional parent doctrines, including de facto parents); Richard F. Storrow, *Parenthood by Pure Intention: Assisted*

*Reproduction and the Functional Approach to Parentage*, 53 Hastings L.J. 597, 666 (2002) (explaining that "[a] [de facto] parent is one who, on a continuing, day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills the child's psychological needs for a parent" (quotation marks omitted)).[9]

[¶45]    Severing a "bonded and dependent" relationship can prove emotionally and psychologically damaging to the child.  *See Pitts*, 2014 ME 59, ¶ 29, 90 A.3d 1169 (recognizing that a central component of de facto parentage law rests upon the determination that the "child's life would be substantially and negatively affected if the person who has undertaken a permanent, unequivocal, committed, and responsible parental role in that child's life is removed from that role"); *Roth v. Weston,* 789 A.2d 431, 445 (Conn. 2002) (noting "when a person has acted in a parental-type capacity for an extended period of time, becoming an integral part of the child's regular routine, that child could suffer serious harm should contact with that person be denied or so

---

[9] *See also*, NeJaime at 545; Feinberg at 320-323; Joanna L. Grossman, *Constitutional Parentage*, 32 Const. Comment. 307, 333-40 (2017); Richard F. Storrow, *Parenthood by Pure Intention: Assisted Reproduction and the Functional Approach to Parentage*, 53 Hastings L.J. 597, 640 (2002) ("For some time now, courts and commentators have developed the concept of functional parenthood as a way to recognize the important relationships children often forge with individuals who function as their parents but who do not have that legal status.").

28

limited as to seriously disrupt that relationship").[10]  Preservation of such a

relationship is at the heart of the legislative policy endorsing de facto

parenthood as an independent ground of legal parentage.[11]

[¶46]  From both a policy and a common-sense perspective, the

requirement of second-parent consent does not, as a matter of fact, bear upon

the assessment of whether a person claiming de facto parent status actually

functioned as a parent as required by sections 1891(3)(A), (B), and (D).  Nor is

it relevant to the issue of whether the claimant and the child have developed a

---

[10] *See also C.C.R.S. v. T.A.M.*, 892 P.2d 246, 258 (Colo. 1995) (cautioning that disrupting emotional bonds between a child and a psychological parent "would likely prove devastating to the child and would result in long-term, adverse psychological effects on the child"); *Youmans v. Ramos,* 711 N.E.2d 165, 173-74 n.20 (Mass. 1999) (recognizing "a child's vulnerability when the bonds with an adult who acts as a de facto parent are broken": "The damage to the child, who cannot understand what is happening, from breaking these bonds is something which even competent psychiatrists may be unable to predict . . . . [S]uch a breach should not be permitted lightly at the request of [a parent] . . . who [herself] created the unfortunate situation"); *V.C. v. M.J.B.*, 748 A.2d 539, 552 (N.J. 2000) (explaining that "the ending of the relationship between the legal parent and the third party does not end the bond that the legal parent fostered and that actually developed between the child and the [de facto] parent").

[11] The importance of preserving such relationships is further underscored by the Act's express endorsement of a policy embracing the potential for more than two parents.  The Act provides in section 1853(2):

> **2. Preservation of parent-child relationship.**  Consistent with the establishment of parentage under this chapter, a court may determine that a child has more than 2 parents.

19-A M.R.S. § 1853(2) (2025).  An adjudication of de facto parentage in a third party certainly affects the rights of existing legal parents, *see Pitts v. Moore*, 2014 ME 59, ¶ 33, 90 A.3d 1169 (recognizing that a "parental rights order may be cumbersome in matters in which there are more than two legal parents"), but it is not a zero-sum determination, *see E.N.*, 255 A.3d at 44 (Biran, J., dissenting) (clarifying that even in cases where the court recognizes a de facto parent, "the nonconsenting legal parent remains a parent to the child").  It is not tantamount to terminating the parental rights of an existing legal parent.

"bonded and dependent relationship." 19-A M.R.S. § 1891(3)(C); *see In re L.J.M.*, 476 P.3d 636, 644 (Wash. Ct. App. 2020) (concluding that the "'parental support' requirement has nothing to do with the child's relationship with [the] other genetic parent . . . [t]he only requirement is that one parent – another parent – support the [putative de facto parent's] relationship with the child" (quotation marks omitted)); *K.A.F. v. D.L.M.*, 96 A.3d 975, 981, 983 (N.J. Super. Ct. App. Div. 2014) (holding that it is "sufficient if only one of the legal custodial parents . . . has voluntarily created [a] [de facto parent] relationship" with the child because "[f]rom the perspective of simple logic, it would be difficult to ignore the 'psychological harm' a child might suffer because he is deprived of the care of a psychological parent simply because only one of his 'legal parents' consented to the relationship"); *see also Unif. Parentage Act* § 609, cmt, 9B U.L.A. 80 (2017) ("In most states, if an individual can establish that he or she has developed a strong parent-child relationship with the consent and encouragement of *a legal parent*, the individual is entitled to some parental rights and possibly some parental responsibilities." (emphasis added)).

[¶47] This is not to suggest that a second legal parent's support of or opposition to another's claim of de facto parentage is immaterial to the court's ultimate determination. On the contrary, it is certainly relevant to, and should

be considered in connection with, the determination of what is in the best interest of the child and whether "continuing [the] relationship between the [putative de facto parent] and the child is in the best interest of the child."[12] 19-A M.R.S. § 1891(3)(E). It is in that context—consideration of the best interest factor in section 1891(3)(E)—that the concern expressed by the Court that one parent "may [be] try[ing] to exclude the other from a parental role" should be assessed, as even the Court seems to tacitly acknowledge. *See* Court's Opinion ¶ 28 (stating that "[s]uch conduct cannot be squared with the child's best interest . . . if [the other] parent is able and willing to exercise parental rights and responsibilities cooperatively and safely"). *Consent* of the other legal parent, whether explicit or implicit, should not be superimposed on section 1891(3)(C), as it was here, to eclipse all other statutory standing factors to prevent adjudication of an otherwise legitimate de facto parentage claim.

---

[12] This may depend upon any number of factors in a particular case, including, for example, the relationship of the parties, the overall family dynamics, and the particular needs of the child. Indeed, the specific concerns about parental discord or alienation should be considered, as the Court suggests, in evaluating whether it is in the best interests of the child to adjudicate a claimant as a de facto parent, continue the relationship, and if so, on what terms. Court's Opinion n.2; *see C.E.W. v. D.E.W.*, 2004 ME 43, ¶ 10, 845 A.2d 1146 (reiterating that "as a corollary of a court's equitable jurisdiction to determine a child's best interest and award parental rights and responsibilities, it may . . . entertain an award of parental rights and responsibilities to a de facto parent").

## B. Constitutional Considerations

[¶48]  The Court considers the standing requirement in cases such as this one to be a bulwark against attempts to cause "'an unconstitutional dilution of another legal parent's rights'"—rights that "may be disrupted if a person must expend resources to defend against a third party's claim of de facto parenthood." Court's Opinion ¶¶ 22, 26 (quoting *Martin*, 2021 ME 62, ¶ 29, 264 A.3d 1224).  While I agree that existing legal parents should be protected against groundless claims, the Act, as written, provides sufficient standing safeguards and the Constitution does not mandate the more restrictive reading reaffirmed by the Court today.

[¶49]  There is no question that we have recognized that parents have a "fundamental liberty interest protected by the Due Process Clause [of the Fourteenth Amendment]" to "control [their children's] upbringing." *Martin*, 2021 ME 62, ¶ 25, 264 A.3d 1224 (quoting *Rideout v. Riendeau,* 2000 ME 198, ¶ 18, 761 A.2d 291); *see, e.g., Lamkin v. Lamkin*, 2018 ME 76, ¶ 12, 186 A.3d 1276; *Davis v. McGuire*, 2018 ME 72, ¶¶ 13-14, 186 A.3d 837; *Curtis v. Medeiros*, 2016 ME 180, ¶ 13, 152 A.3d 605; *Dorr v. Woodard*, 2016 ME 79, ¶¶ 11-12, 140 A.3d 467; *Conlogue v. Conlogue*, 2006 ME 12, ¶ 12, 890 A.2d 691; *Davis v.*

32

*Anderson*, 2008 ME 125, ¶ 18, 953 A.2d 1166; *C.E.W. v. D.E.W.*, 2004 ME 43, ¶ 14, 845 A.2d 1146; *Philbrook v. Theriault*, 2008 ME 152, ¶ 17, 957 A.2d 74.

[¶50]  We have also acknowledged, however, that this due process right is "not . . . absolute."  *Rideout*, 2000 ME 198, ¶ 19, 761 A.2d 291 ("The Due Process Clause is not an impenetrable wall behind which parents may shield their children."); *see also Pitts*, 2014 ME 59, ¶ 12, 90 A.3d 1169 (noting that the "constitutional liberty interest in family integrity is not . . . absolute" (quotation marks omitted)).  Parental rights may be terminated outright if a parent is found to be unfit and it is in the child's best interest to do so.  *See* 22 M.R.S. § 4050, 4055 (2025); *Adoption of Isabelle T*, 2017 ME 220, ¶ 32, 175 A.3d 639; *In re Scott S.*, 2001 ME 114, ¶¶ 14, 17-21, 775 A.2d 1144; *In re Christmas C.*, 1998 ME 258, ¶ 11, 721 A.2d 629; *see also Santosky v. Kramer*, 455 U.S. 745, 769-70 (1982).

[¶51]  Moreover, in the context of a contested parental rights or guardianship proceeding, a parent's constitutional liberty interest in controlling a child's upbringing commonly yields to a judicial determination of what is in the best interests of the child.  *See, e.g., Jacobs v. Jacobs*, 507 A.2d 596, 598-600 (Me. 1986); *Nadeau v. Nadeau*, 2008 ME 147, ¶ 38-41, 957 A.2d 108; *Pearson v. Wendell*, 2015 ME 136, ¶ 30-31, 125 A.3d 1149.  In these

circumstances, the court is exercising its *parens patriae* powers and "put[ting] itself in the position of a wise, affectionate, and careful parent and mak[ing] determinations for the child's welfare, focusing on what is best for the interest of the child and not on the needs or desires of the parents." *C.E.W.*, 2004 ME 43, ¶ 10, 845 A.2d 1146 (quotation marks omitted).

[¶52]   In considering the reach of this constitutional due process limitation on legislative authority to define de facto parentage, it is important to take into account not only the context in which the right is being invoked but also the very nature and source of the right itself. *Cf. Bouchard v. Dep't of Pub. Safety*, 2015 ME 50, ¶ 8, 115 A.3d 92 (holding that one challenging the constitutionality of a statute "bears a heavy burden" and "must demonstrate convincingly that the statute and the Constitution conflict" (quotation marks omitted)).   In that regard, it is significant that our jurisprudence espousing a parent's Fourteenth Amendment liberty interest in raising a child rests predominantly, if not exclusively, upon the foundational United States Supreme Court case of *Troxel v. Granville,* 530 U.S. 57, 65 (2000)*. See, e.g.*, *Rideout*, 2000 ME 198, ¶ 7, 761 A.2d 291; *Pitts*, 2014 ME 59, ¶¶ 10-11, 90 A.3d 1169; *Conlogue*, 2006 ME 12, ¶ 7, 890 A.2d 691; *Davis*, 2018 ME 72, ¶ 13, 186 A.3d 837; *Martin*,

2021 ME 62, ¶ 25, 264 A.3d 1224. Close examination of *Troxel* is therefore warranted.

[¶53] *Troxel v. Granville*, which some have viewed as "an extremely narrow decision," *see Conover v. Conover,* 146 A.3d 433, 444 (Md. 2016), did not involve an instance of parental recognition; it was decided in a wholly different context. In *Troxel*, the paternal grandparents sought court-ordered visitation with their grandchildren over the objection of the mother. 530 U.S. at 60. Their petition was filed pursuant to a Washington state statute that provided that "[a]ny person may petition the court for visitation rights at any time" so long as such visitation was in the child's best interest. *Id.* at 61 (quotation marks omitted). The grandparents had not served in a primary caretaking role and were merely seeking additional visitation. *Id.*

[¶54] There were six separate opinions in *Troxel*, with no majority and three dissents. Justice O'Connor, writing for a plurality of the Court, held that, as applied,[13] the "breathtakingly broad," nonparental-visitation statute at issue in *Troxel* violated a parent's due process rights because it "effectively permit[ed] any third party seeking visitation to subject any decision by a parent

---

[13] The plurality also clarified that it "would be hesitant to hold that specific *nonparental* visitation statutes violate the Due Process Clause as a *per se* matter." *Troxel v. Granville,* 530 U.S. 57, 73 (2000) (emphasis added).

concerning visitation of the parent's children to state-court review." *Id.* at 67. Rather than announce broadly applicable constitutional principles, the holding in *Troxel* was narrow and case-specific.

[¶55] Two of the dissenting opinions in *Troxel* underscored this point; they emphasized that the parental due process liberty interest under the Fourteenth Amendment is not absolute and cautioned against an overly broad application. *Id.* at 88, 91 (Stevens, J., dissenting); *id.* at 98 (Kennedy, J., dissenting). Justice Stevens expressed concern about the potential effect of the plurality's decision on the interests of children in cases involving "a once-custodial caregiver," particularly in light of "[t]he almost infinite variety of family relationships that pervade our ever-changing society." *Id.* at 85, 90; *see also id.* at 88 ("A parent's rights with respect to her child have thus never been regarded as absolute, but rather are limited by the existence of an actual, developed relationship with a child, and are tied to the presence or absence of some embodiment of family."). Justice Kennedy noted that "a fit parent's right vis-a-vis a complete stranger is one thing; her right vis-a-vis another parent or a *de facto* parent may be another." *Id.* at 100-01.

[¶56] Bagrii is not just any third party seeking "to obtain parental rights through litigation, over the objections of parents," to someone else's child.

36

*See Martin*, 2021 ME 62, ¶ 25, 264 A.2d 1224 (quoting *Philbrook*, 2008 ME 152, ¶ 17, 957 A.2d 74); *E.N. v. T.R.*, 255 A.3d 1, 44 (Md. 2021) (Biran, J., dissenting) (noting that when addressing a claim of de facto parentage, "we are not dealing here with any third party" but one who "would also be a legal parent of the child" (quotation marks and alteration omitted)).  She was not a casual or occasional caretaker.  Her involvement with the children did not arise out of externally imposed obligations, such as a court-ordered guardianship or a foster care placement.  Nor did she have an independent, preexisting, familial connection to the children, such as a grandparent or other relative who was not part of the nuclear family.

[¶57]  The District Court found that Bagrii actually "was [a] parent" to the children, with whom she had developed a "bonded relationship."[14]  Bagrii had, in the words of Justice Stevens, an "actual, developed relationship" with the children "tied to . . . [an] embodiment of family."  *See Troxel*, 530 U.S. at 88.  And

---

[14]  The Court attempts to minimize or deny the significance of Bagrii's relationship with the children by referencing certain record evidence, including the guardian ad litem's recommendation "against granting Bagrii contact with the children because the children did not want it and had disclosed physical abuse by Bagrii and inappropriate conduct by one of her children."  Court's Opinion ¶ 19.  While those may certainly be proper considerations for the court to weigh in determining the merits of Bagrii's parentage claim or, if she were to prevail on the de facto parentage claim, the extent of her ongoing parental rights and responsibilities, they are inapposite to the issue of standing.  The District Court already determined for purposes of standing that Bagrii had demonstrated by a preponderance of the evidence that she had developed a "bonded relationship" with the children and that continuation of the relationship was in their best interests.

the District Court expressly found for purposes of standing that it was in the children's best interest to continue the connection with her. *See E.N.*, 255 A.3d at 45 (Biran, J. dissenting) ("If the relationship has developed over a significant period of time in which the adult performed caregiving functions for the child as a member of the same household, the putative *de facto* parent is not a 'pure third party,' regardless of whether only one legal parent or both legal parents fostered the relationship and bond.").

[¶58] *Troxel*, therefore, neither requires nor justifies an inflexible, overly expansive application of a parent's Fourteenth Amendment due process rights in this context. *See In re Parentage of L.B.*, 122 P.3d 161, 178 (Wash. 2005) (concluding that "*Troxel* does not establish that recognition of a *de facto* parentage right infringes on the liberty interests of a biological or adoptive parent"); *Smith v. Guest,* 16 A.3d 920, 930-31 (Del. 2011) (concluding that *Troxel* had more limited applicability to a de facto parentage claim). Nor does it "place any constitutional limitations on the ability of states to legislatively, or through their common law, define a parent or family." *In re Parentage of L.B.*, 122 P.3d at 178. Moreover, several additional reasons support a more balanced, nuanced consideration of this due process liberty interest when addressing a party's standing to pursue a claim of de facto parentage.

[¶59]  First, there is undoubtedly a compelling, counterbalancing interest in preserving a "bonded and dependent" relationship that has formed between a child and a person functioning as a parent and whom the child views as a parent.  Severing a secure, parental attachment can have traumatic, life-altering consequences.  *See supra* ¶ 45; *E.N.*, 255 A.2d at 54 (Biran, J., dissenting); Jessica Feinberg, *The Boundaries of Multi-Parentage*, 75 SMU L. Rev. 307, 351 (2022) ("A wide body of social science research demonstrates that disrupting the relationship between a child and someone who they view as a parent can result in serious short- and long-term harm to the child."); s*ee also Pitts*, 2014 ME 59, ¶¶ 12, 14-15, 90 A.3d 1169 ("[T]he rights of another person—the child—must also be protected by the State.")  Moreover, a person asserting a claim of de facto parenthood, if successful, "has the same fundamental rights as the biological or adoptive parent." *In re K.S.*, 2014 ME 71, ¶ 6, 93 A.3d 687; *see supra* ¶¶ 42-43.  Those rights remain inchoate until adjudicated; once declared, however, the rights of a de facto parent would be entitled to equivalent constitutional due process protection.[15]

---

[15]  Thus, the relationship between a child and a de facto parent may itself implicate interests of constitutional dimension:

> The more that we see de facto parents as parents, rather than as nonparent third parties, the more we might see de facto parents, as well as the children they are raising, as having constitutional interests in maintaining the parent-child relationship.  We might begin to reason about the constitutional stakes of de facto

[¶60] Second, the Act's requirements for establishing de facto parentage, including section 1891(3)(C) as plainly written, are narrowly tailored and provide clear standards and procedures to protect the rights of existing legal parents. All legal parents must be joined as parties and served with the pleadings and supporting affidavit.[16] 19-A M.R.S. §§ 1836, 1891(2)(A) (2025). The standing requirements are strict. Persons claiming de facto parent status must demonstrate that they have "fully and completely undertaken a permanent, unequivocal, committed and responsible parental role in the child's life" by satisfying each of the constituent elements in section 1891(3)(C)—now, by a preponderance of the evidence.[17] 19-A M.R.S § 1891(3); *Davis*, 2018 ME

---

parenthood not from the perspective of the objecting parent's right to exclude but instead from the perspective of the functional parent's right to parent—and the child's right to maintain that parental relationship.

NeJaime at 553; *see also Smith v. Guest*, 16 A.3d 920, 931 (Del. 2011) (rejecting a challenge to Delaware's de facto parentage statute, reasoning that "[t]he issue here is not whether the Family Court has infringed [the biological parent's] fundamental parental right to control who has access to [the child] by awarding [the de facto parent] co-equal parental status [but] [r]ather . . . whether [the de facto parent] is a legal "parent" of [the child] who would also have parental rights to [the child]— rights that are co-equal to [the biological parent's]").

[16] *Martin* references these provisions as further support for its conclusion that second-parent consent is constitutionally required. 2021 ME 62, ¶ 30, 264 A.3d 1224 (stating that this "conclusion is consistent with Maine's de facto parentage statute, which requires 'all parents and legal guardians of the child' to be served with a de facto parentage filing" (quoting 19-A M.R.S. § 1891(2)(A)). I disagree. The statute's requirement that existing parents and legal guardians be served with notice and given an opportunity to be heard is consistent with fundamental procedural due process protections; it neither presupposes nor requires the consent of existing legal parents or guardians as an element of a de facto parentage claim.

[17] Despite the Act's express requirement that standing be demonstrated by "*prima facie* evidence of the requirements set forth in [section 1891(3)(C)]," 19-A M.R.S. § 1891(2)(C) (emphasis added),

72, ¶ 26, 186 A.3d 837.  Once standing is demonstrated, a claimant then must meet the higher burden of proving the same statutory elements by clear and convincing evidence, 19-A M.R.S. § 1891(3)—the highest burden of proof in a civil proceeding and the same burden that applies in actions to terminate parental rights.  *See* 22 M.R.S. § 4055.  The numerous, and exacting, statutory elements in section 1891(3) combined with the elevated burden of proof a claimant must meet to establish de facto parentage provide sufficient constitutional protections for existing legal parents.  *See* Feinberg at 350-51; *E.N.*, 255 A.3d at 44 (Biran, J., dissenting).

[¶61] Finally, erecting an overly burdensome standing barrier is not only unnecessary from a constitutional perspective but ignores the necessary predicate required by both this Court and the Legislature for establishing

---

our decision in *Davis v. McGuire* held that the reference to "*prima facie*" evidence was "merely a *temporal indicator* that the standing requirement is to be determined preliminary to any ultimate adjudication of de facto parenthood" and that the proper quantum of proof at this stage was the higher, preponderance-of-the-evidence standard.  2018 ME 72, ¶¶ 22, 26, 186 A.3d 837 (emphasis added).  I disagree with the characterization of "*prima facie*" evidence as "merely a temporal indicator."  Rather, it is clearly an explicit legislative determination as to the quantum of evidence considered appropriate to advance a claim to the merits—a lower level of proof consistent with the gatekeeping function of standing to winnow out frivolous or facially baseless claims.  *Davis*'s rationale for stretching the statute's language beyond its plain meaning was driven largely by the concern that "legal parents could face excessive exposure to unwarranted and ultimately unsubstantiated interference with their constitutionally protected parenting interest."  *Id.* ¶ 23.  However, for the reasons discussed herein—including the overly expansive application of *Troxel*'s due process liberty interest our caselaw has afforded in this context—*Davis*'s interpretation raises the standing bar higher than constitutionally or practically necessary and, ironically, may invite more rather than fewer hearings on the question of standing, potentially increasing the "unwarranted" and "unsubstantiated interference" with "constitutionally protected parenting interest[s]" that *Davis* sought to avoid.

de facto parentage rights—litigating the claim. An adjudication of de facto parent status itself presumes, indeed requires, litigation. *See* 19-A M.R.S. § 1891(2), (3) (codifying this Court's approach to adjudicating de facto parent claims). It would be pointless and illogical to recognize—as both this Court and the Legislature have recognized—a legal ground of parentage that depends upon judicial adjudication and then declare that requiring existing legal parents to participate in that adjudication amounts to "disrupt[ing]" or infringing their rights. *See* Court's Opinion ¶ 22.

## III. CONCLUSION

[¶62] The protections that the Act provides are constitutionally sufficient without having to read section 1891(3)(C)'s "fostered or supported by another parent" provision as the Court does here. Accordingly, I am inclined to revisit—and overrule—*Martin*, particularly as it applies to the determination of standing. I would vacate the District Court's denial of standing in this matter and remand for a determination of Bagrii's claim of de facto parent status on its merits.[18]

---

[18] Since the District Court has already conducted a full evidentiary hearing, such a determination could be made on the existing record. *See Young v. King*, 2019 ME 78, ¶ 13 n.4, 208 A.3d 762 (noting that courts may hold a single consolidated hearing addressing both standing and the merits in de facto parentage actions). I would leave to the District Court's discretion whether a supplemental hearing is needed.

Cory R. McKenna, Esq. (orally), McKenna PLLC, Portland, for appellant Kateryna A. Bagrii

Erik T. Crocker, Esq. (orally), Farrell, Rosenblatt & Russell, Bangor, for cross-appellant John Campbell

Jie Chen did not file a brief

Newport District Court docket number FM-2021-132
FOR CLERK REFERENCE ONLY